**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| SHANNON COLEMAN, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 14-cv-2015 |
| | ) | |
| v. | ) | Judge Robert M. Dow, Jr. |
| | ) | |
| ROBERT W. DEPKE JUVENILE | ) | |
| JUSTICE CENTER A/K/A | ) | |
| NINETEENTH JUDICIAL DISTRICT, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Shannon Coleman ("Plaintiff") brings this action against Defendant Robert W. Depke Juvenile Justice Center a/k/a Nineteenth Judicial District ("Defendant" or "DJJC") for Title VII race discrimination/disparate treatment arising out of his termination in April 2013.[1] This matter is before the Court on Defendant's motion for summary judgment [57]. For the reasons explained below, Defendant's motion [57] is granted. Judgment will be entered in favor of Defendant.

**I.      Background**

The Court takes the relevant facts from the parties' Local Rule 56.1 statements and exhibits thereto, [59], [72], [74], and [81]. The following facts are undisputed unless otherwise noted.

Plaintiff is an African-American man who resides in Lake County, Illinois. Defendant is a body politic of Vernon Hills, Illinois and houses court facilities under the purview of the Chief Judge of the Nineteenth Judicial Circuit Court as well as unrelated county facilities. On August

---

[1] Pursuant to the parties' stipulation, Plaintiff agrees that he is not asserting a separate claim of discrimination based upon Defendant's suspension of him in 2011. See [42] & [74] at 28.

20, 2001, Plaintiff began employment with the Administrative Office of the Nineteenth Judicial Circuit Court as a part-time Juvenile Detention Officer, a non-sworn position, located at the DJJC. Plaintiff's position became full-time just before 2002.

In July 2005, Plaintiff was given a promotion to Senior Juvenile Counselor. Juvenile Counselors perform work in the field of community corrections with juvenile offenders, counseling, supervising, processing records, evaluating and making recommendations on incoming referrals and/or juveniles held in detention. In 2008, Plaintiff applied for and was subsequently approved for a Career Path promotion to Senior Juvenile Counselor by Robert Zastany, the Executive Director for the Nineteenth Judicial Circuit.

On June 15, 2010, Plaintiff acknowledged that he had previously read the Nineteenth Judicial Circuit—Lake County Employee Handbook and Annexes, that the Handbook and Annexes had been updated and should have been re-read, that he understood he was expected to comply with the policies contained therein, that he also read the Ethics Policy (part of the Annexes), and that he understood that employees of the Nineteenth Judicial Circuit are at-will employees serving at the discretion of the Chief Judge.

Plaintiff worked in DJJC's Detention Unit until March 21, 2012 when he transferred to the Intake Unit. Plaintiff's job responsibilities as a Juvenile Counselor in the Detention Unit included ensuring the safety and security of the staff and residents (minors in secured detention), counseling residents, monitoring residents, conducting group discussions with residents, facilitating daily skills groups to encourage a good standard of morals and values, and transporting minors to and from Court.

Plaintiff's job responsibilities as a Juvenile Counselor in the Intake Unit included making custody decisions such as detaining or releasing a juvenile to the custody of their parents under

certain conditions, making recommendations to the State's Attorney Office, providing information and explaining services to families of minors, documenting information, preparing reports, and assisting the court in determining the levels of intervention needed in order to impact delinquent behavior, and making suggestions to the court to eliminate or reduce recidivism. Plaintiff had knowledge of certain delinquencies and crimes that the residents committed or had been accused of committing. Plaintiff also had knowledge regarding some of the causes, treatment, and prevention of delinquency and crime. Plaintiff was expected to exhibit good judgment and be a positive role model for the residents at the DJJC and his co-workers. It was important for Plaintiff to carry himself in a professional manner both at work and in the community. Pursuant to the Nineteenth Judicial Circuit Court Employee Handbook, "[c]onfidence in the ability of employees to discharge their responsibilities and to command the trust and confidence of the Chief Judge is essential to continued employment." [63-15] at 52.

Approximately three months after he began his full-time employment as a Juvenile Counselor, Plaintiff was issued a gold, five-point star badge that identified his job title, county in which he worked, and the state. Plaintiff always kept the star badge in the visor of the vehicle he was driving. The Employee Handbook states: "[T]he Badge/Card is for identifying you to other law enforcement agencies, to Court Security, and for responding to a request for identification. Badges and Identification Cards shall not be used in an unprofessional manner." [63-15] at 48. Plaintiff admits that he was not allowed to "use the badge for unauthorized, non-work related purposes, or in an unprofessional manner" to the extent that this means that he was not allowed to use his badge to gain any special treatment, authority, or information outside of work for himself or his family. [74] at 7. However, Plaintiff disputes Defendant's assertion that he was not allowed to use the badge for *any* non-work related purposes. See *id*. at 6-7. Plaintiff

elaborates: "Admittedly, during Plaintiff's deposition, when Plaintiff was asked whether he was allowed to use his badge for non-work related purposes, he answered, not to my knowledge…. However, the term 'use' in the context of the question and obvious circumstances surround[ing] the case, would imply something along the lines of seeking a benefit or preferential treatment outside of work or to assert a special position of authority outside of work.  To the extent that Defendant is alleging that an employee could not even display his or her badge in any way unless it was being displayed in a 'work related' situation, Defendant's own policy contradicts that allegation."  [74] at 7.

In Plaintiff's chain of command, the Director is Robert Cesar.  Directors have supervisory authority to impose discipline to subordinate employees up to and including a three-day suspension without pay and administrative leave for investigation of employees. Supervisors review situations, interpret policies of the Nineteenth Judicial District, and select the form of discipline; while they are encouraged to use progressive discipline when appropriate, each case stands on its own merits.  Next in the chain of command is the Executive Director, Robert Zastany.  The Executive Director of the Administrative Office of the Nineteenth Judicial Circuit has supervisory authority to discipline up to and including discharge of paid County employees, but not including the discharge of sworn paid County employees (Probation Officers and Juvenile Counselors) and State employees.  The Chief Judge has the sole authority to discharge sworn staff (Probation Officers and Juvenile Counselors).  All significant personnel actions are briefed to the Chief Judge to see if there are any concerns, directions, or observations that may shed light onto a situation.

On the evening of March 31, 2013, Officer Michael Platt made a traffic stop of Plaintiff and his passenger.  As Officer Platt approached the window of Plaintiff's vehicle, Plaintiff

"presented [him] with a five-pointed badge." [63-18] at 6, Tr. p. 19:17-18. The badge was in Plaintiff's left hand, facing out toward Officer Platt, and was visible to Officer Platt. *Id*. at 7, Tr. p. 22:1-19. Officer Platt asked Plaintiff if the five-pointed badge was a North Chicago Police star because, due to the nighttime hours and the coloring of the badge, it looked at first like a North Chicago Police star. Plaintiff told him it was not. When Officer Platt looked at the five-pointed badge again he was able to see that it was a Lake County Probation Officer badge. *Id*., Tr. p. 21:1-6. Officer Platt testified that it was not unusual for law enforcement personnel to present a badge in their window during a traffic stop to alert him that they are "on the same team," that they may have a lawful weapon in the vehicle, and to alleviate worry about the situation escalating into violence. [63-18] at 7-8, Tr. pp. 23:20-25:12; 13, Tr. pp. 46:10-47:5.

Officer Platt observed the strong odor of cannabis coming from inside of the vehicle. [63-18] at 8, Tr. p. 26:16-24. He asked for Plaintiff's and his passenger's identification and returned to his police car to wait for his partner. *Id*., Tr. p. 27:3-6. After his partner arrived, Officer Platt asked Plaintiff to exit his vehicle so the two men could speak. *Id*., Tr. p. 27:15-16. Officer Platt explained that he "intended to search the inside of the car, based on the odor of the cannabis coming in from inside it, and . . . asked him if there was anything in the car that [he] should know about." *Id*., Tr. p. 27:19-23. According to Officer Platt, Plaintiff told him "that the passenger had been smoking a blunt in the passenger seat and had just recently put it out." *Id*., Tr. p. 28:15-17. The police report also indicates that the passenger admitted he had been smoking a blunt. The DVD of Officer Platt's dash-cam shows that during the traffic stop, Officer Platt asked Plaintiff, "If you are a probation officer, why are you letting somebody smoke weed in your car?" [74] at 14.

Officer Platt searched the interior of Plaintiff's vehicle, where he located a bag with a green leafy substance, presumed to be cannabis, inside a cigar box that was inside the center console. He also found a switch-blade knife in the center console and a bottle of tequila behind the driver's seat that was partially full and not factory sealed. According to the police report, Plaintiff stated that none of these items were his.

Officer Platt testified that the traffic stop of Plaintiff was unusual because this was the only time he had experienced a person display an ID or badge to identify himself as part of the law enforcement community while at the same time observing the smell of cannabis and finding cannabis in the vehicle. [63-18] at 13, Tr. pp. 45:2-10; 47:16-48:2. Officer Platt opined that he found it inappropriate that Plaintiff displayed his badge "under the circumstances, because [Plaintiff] told [Officer Platt] that the passenger had just finished smoking a blunt inside of the car," which would, "in [Officer Platt's] opinion, be contradictory to being on the law enforcement side, if you will, or within the law enforcement community." *Id.*, Tr. p. 47:16-23. Nonetheless, Officer Platt testified that Plaintiff's display of the badge did "still put [him], to some degree, at ease" because it told him "a little bit, that I probably would not have to fight with that person." *Id.*, Tr. p. 48:3-7. Officer Platt also testified that Plaintiff was cooperative throughout the stop, did not resist him throughout the stop, and did not specifically ask for special treatment because he was a probation officer. Officer Platt did not give Plaintiff a breathalyzer test because, based upon his interaction with Plaintiff, he did not believe him to be under the influence of alcohol.

Plaintiff and his passenger were arrested and transported to the Lake County Jail. Officer Platt completed the charging documents, and a police report which recorded the events that transpired during the traffic stop and arrest. Plaintiff was charged with a traffic citation for

speeding, a traffic citation for illegal transportation of alcohol based upon the open container of tequila, and two non-traffic citations for unlawful use of weapons and possession of cannabis. Officer Platt requested that the Lake County Sheriff's Department dispatchers contact Defendant to confirm Plaintiff's employment because he was investigating whether to charge Plaintiff with impersonation of a Probation Officer or a Peace Officer. The dispatchers confirmed that Plaintiff was a juvenile probation employee and did not investigate the issue further.

On April 1, 2013, Cesar learned that the Lake County Sheriff's Department had called to confirm Plaintiff's employment and that Plaintiff had been arrested and criminally charged. Cesar made the recommendation for Plaintiff to be placed on administrative leave and Zastany approved of that decision. Cesar testified that he put Plaintiff on administrative leave in order to find out more information about the arrest and criminal charges. Zastany testified that when an employee is arrested, it is protocol to suspend them with pay and have them turn in their materials while an internal investigation can be performed, which includes obtaining a copy of the police report. After Plaintiff was put on administrative leave, Cesar received copies of the police report and dash-cam police video that was taken at the time of Plaintiff's traffic stop and arrest. Cesar testified that the dash-cam police video showed that Plaintiff had his badge in his hand, where it was visible. [63-5] at 9, Tr. p. 29:15-17.

On April 15, 2013, Cesar and Marci Jumisko, the Director of Administrative Services for the Nineteenth Judicial Circuit, recommended to Zastany that Plaintiff's employment with the Nineteenth Judicial Circuit should be terminated immediately. At the time Cesar recommended Plaintiff for termination, the only information he had concerning Plaintiff's arrest was the police report and arrest video. At no point did Cesar ask Plaintiff about what happened regarding the arrest or his version of events. Cesar testified that, if he was the decision maker, anyone would

be terminated under circumstances similar to Plaintiff's arrest, but he had never before been presented with the number of violations of policies that occurred during Plaintiff's traffic stop and arrest. In particular, Cesar testified that he recommended that Plaintiff be terminated because, "to the best of [his] knowledge, [Plaintiff] was arrested with both marijuana and alcohol in the car, additionally to that, he exhibited his probation credentials in a non-business situation to the police officer, which would not typically be appropriate for that situation," and "ultimately, the arrest and charge for those types of violations is the reason[] for his dismissal." [63-5] at 8, p. 25:2-13.

Plaintiff's termination letter reflects that Jumisko and Cesar concluded that Plaintiff violated the following policies and procedures of the Nineteenth Judicial Circuit Employee Handbook: (1) unlawful possession of drugs and/or narcotics; (2) violation of federal, state or local laws or regulations, or Court Orders; (3) violation of any provision in the Handbook or of any oral or written directive including, without limitation, engaging in activities contrary to those set forth in the Circuit's Ethics Policy; and (4) conduct in the community so as to diminish the integrity of the Circuit, and/or the employee's credibility or capability to perform as an employee of the Circuit. [63-22] at 2. The termination letter further explained that Plaintiff violated the following policies and procedures of the Nineteenth Judicial Circuit's Ethics Policy:

> Principle Four – Impropriety and the Appearance of Impropriety
>
> An employee shall avoid impropriety and the appearance of impropriety and shall respect and comply with the law and conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary.
>
> An employee shall refrain from engaging in any activity that would put into question the propriety of the employee's conduct in carrying out the duties of the office or cast doubt upon the integrity and impartiality of the legal system.

An employee shall not allow family, social, or other relationships to influence official conduct or judgment and should avoid any conduct that gives the impression that the employee can be improperly influenced in the performance of his or her official duties.

Principle Five – Abuse of Position.

An employee shall demonstrate the highest standards of personal integrity, honesty, and truthfulness in all professional and personal dealings. An employee shall not use his or her position, badge, or any form of identification of the Nineteenth Judicial Circuit – Lake County to secure unwarranted privileges or exemptions for himself or herself or for a family member or close relative.

[63-22] at 2-3.

As Executive Director, Zastany was responsible for making recommendations to the Chief Judge regarding the termination of employment of sworn staff. Zastany reviewed the police report and Cesar's and Jumisko's recommendation, agreed with the recommendation, and approved of it by recommending to the Chief Judge that Plaintiff be terminated. Cesar testified that Zastany could have decided not to take his recommendation to terminate Plaintiff and recalled that from time to time in the past Zastany has suggested a different path of discipline other than what was suggested. Zastany was aware at that time that Plaintiff was African-American. Chief Judge Fred Foreman reviewed the matter and concurred that Plaintiff should be terminated effective April 15, 2013. See [63-24]. The decision to terminate Plaintiff was made prior to the disposition of Plaintiff's charges. The disposition of all charges against Plaintiff was *nolle prosequi*.

Plaintiff alleges that he was discriminated against based on his race when Defendant terminated his employment. At his deposition, Plaintiff testified that Cesar never made any derogatory comments to him based on his race. Instead, Plaintiff testified that he believed Cesar discriminated against him because he was not treated fairly or equally in comparison to three former co-workers, a Principal Probation Officer (Employee X), and two Juvenile Counselors

(Employees Y and Z) for alcohol-related criminal offenses. In response to summary judgment, however, Plaintiff contends only that Employee X is similarly situated to him for purposes of analyzing his Title VII discrimination claim.

A Principal Probation Officer (like Employee X) is a different position than a Juvenile Counselor (like Plaintiff), with different responsibilities, pay, and class name, and is part of a different department. Nonetheless, Defendant's disciplinary and ethics policies apply equally to non-senior, senior, and principal juvenile probation officers and juvenile counselors, which are both referred to generally as "probation officers" according to Mr. Zastany and Defendant's employee handbook.

The relevant facts as to Employee X are as follows: Employee X is white. In 2004, Employee X notified the then-Director of Juvenile Probation, Louise Loud, an African American, that he had been arrested for driving under the influence of alcohol and failing to take a field sobriety test. Employee X temporarily lost his driving privileges. Loud concluded that "disciplinary action must be taken, given the facts documented in the [arresting officer's] report and [Employee X's] failure to cooperate with the request of an officer." [59-26] at 2. Loud proposed that, in lieu of bringing his arrest before an investigatory hearing panel, Employee X would be demoted to a Senior Probation Officer and placed on probation, during which he would not be considered for any promotions. See *id*. Employee X accepted Loud's proposal. He was not recommended for termination and was not terminated.

At the time of Employee X's arrest, Cesar was the Assistant Director of Probation. In that position, he had authority to recommend termination of an employee. See [63-5] at 11, Tr. pp. 39:13-40:12. However, while in that position, he did not make any disciplinary recommendations regarding arrests or convictions for driving under the influence of alcohol.

10

[63-5] at 19, Tr. 72:16-21.  Cesar also was not Employee X's supervisor, did not "oversee" Employee X, and "wasn't a part of any disciplinary action" involving Employee X.  [63-5] at 12, Tr. p. 44:11-16.  Cesar heard that Employee X "had been arrested."  *Id.* at Tr. p. 44:11-14. Cesar's understanding was that Employee X was arrested for "either having possession [of alcohol] or drinking while driving" and lost his license, [63-5] at 13, Tr. 46:6-10, 21-23, but was not aware that Employee X had failed to cooperate with the arresting officer or to submit to a field sobriety test, *id.*, Tr. 46:14-20.  Cesar also knew that Employee X was white.

At the time of Employee X's arrest, Zastany was Executive Director (as he was at the time of Plaintiff's arrest).  According to Zastany, Loud recommended to "reduce, freeze [Employee X] in his position," rather than terminate him.  [59-16] at 15, Tr. p. 54: 9-12.  Zastany did not recommend to then-Chief Judge Mullen that Employee X be terminated, although he could have recommended termination despite Loud's recommendation of lesser discipline.  See *id.*, Tr. pp. 54:4-6, 54:19-55:10.  Zastany testified that he recommended Plaintiff for termination, but not Employee X, because in both cases he was following the directors' recommendations. Zastany further testified that all significant personnel actions are briefed to the Chief Judge and that he was "sure the Chief Judge got a briefing on" the disciplinary action against Employee X, but that he did not recall specifically whether he was the one who briefed the Chief Judge.  See *id.*, Tr. pp. 55:19-20, 56:9-18.   Only the Chief Judge may make the final decision for termination.

About five years later, in 2009, Employee X was disciplined again.  Director Joseph Kelroy made the decision to restrict Employee X to his office for the day because he smelled like alcohol.  Kelroy made Cesar (who by this time had been promoted to Director of Juvenile Probation) aware of the situation by copying him on the memorandum that was issued to

Employee X. Cesar testified that he did not recall if he asked Employee X whether he had been drinking, if there had been any "follow up with [Kelroy] on this situation," or if he spoke to Kelroy about the memorandum. See [81] at 20-21.

On December 17, 2013, Plaintiff filed a charge of discrimination against Defendant with the United States Equal Employment Opportunity Commission ("EEOC") alleging that he was discriminated against based on his race when he was discharged from his position on April 15, 2013. The EEOC mailed a Notice of Right to Sue to Plaintiff on December 24, 2013. On March 21, 2014, Plaintiff commenced an action in this Court for race discrimination and filed an Amended Complaint on December 15, 2014.

At his deposition, Plaintiff testified that the only person he believed discriminated against him was Cesar. See [63-4] at 30, Tr. p. 113:14-17 (Q: "Is there anyone other than Mr. Cesar that you believe discriminated against you with respect to your termination?" A: "No."). However, in opposition to Defendant's motion for summary judgment, Plaintiff submits a declaration stating that, "[b]ased upon additional information brought to light in Defendant's responses to written discovery requests and the deposition testimony of Mr. Cesar and Executive Director Robert Zastany, I believe that Mr. Zastany also discriminated against me, as he was the final decision maker prior to submission to the Chief Judge for approval, and he had also been the final decision maker concerning [Employee X's] arrest." [71-1] at 1. Defendant argues that the Court should not consider the declaration because there is no new evidence to support Plaintiff's change of position and "Plaintiff's 'new' assertion cannot defeat Defendant's summary judgment motion." See [82] at 3. While it is true that a litigant is not allowed "to manufacture material fact questions by affidavit testimony that contradicts prior sworn testimony," *United States v. Funds in Amount of One Hundred Thousand One Hundred & Twenty Dollars ($100,120.00)*, 730

F.3d 711, 718 (7th Cir. 2013), it is not clear that this principle is applicable here. Plaintiff explains in his declaration that he learned about Zastany's involvement in the decision to terminate him only after engaging in discovery. Therefore, it is plausible that at the time Plaintiff was deposed, he did not have the information necessary to testify that Zastany discriminated against him by treating him less favorably than Employee X. "A contradictory supplemental affidavit is … permissible if it is based on newly discovered evidence." *Bank of Illinois v. Allied Signal Safety Restraint Systems*, 75 F.3d 1162, 1172 (7th Cir. 1996).

## II.        Summary Judgment Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by … citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "fails to make a showing sufficient

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

## III. Analysis

To defeat summary judgment on his Title VII claim based on his April 2013 termination, Plaintiff has the initial burden of establishing that (1) he is a member of a protected class, (2) he performed reasonably on the job in accord with Defendant's legitimate expectations, (3) despite his reasonable performance, he was subjected to an adverse employment action, and (4) similarly situated employees outside of his protected class were treated more favorably by Defendant. *David v. Board of Trustees of Community College District No. 508*, 846 F.3d 216, 225 (7th Cir. 2017). "If the plaintiff satisfies that burden, then the employer must articulate a legitimate, nondiscriminatory reason for the adverse employment action, at which point the burden shifts back to the plaintiff to submit evidence that the employer's explanation is pretextual." *Id*. (internal quotation marks and citation omitted).

The legal standard for considering a summary judgment motion on a claim of intentional discrimination is "simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th

Cir. 2016). "Evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself—or whether just the 'direct' evidence does so, or the 'indirect' evidence. Evidence is evidence." *Id*.

In this case, the first and third elements of Plaintiff's prima facie case are undisputed. Plaintiff is a member of a protected class (African American) and suffered an adverse employment action (termination). The second element is undisputed as well; Plaintiff acknowledges that he was "guilty of poor judgment," [73] at 1, essentially conceding that he was not meeting his employer's legitimate expectations. In particular, Cesar and Defendant's Human Resources Director concluded that Plaintiff's conduct violated the following policies: (1) unlawful possession of drugs and/or narcotics; (2) violation of federal, state or local laws or regulations, or Court Orders; (3) violation of any provision in the Employee Handbook[2] or of any oral or written directive including, without limitation, engaging in activities contrary to those set forth in the Circuit's Ethics Policy[3]; (4) conduct in the community so as to diminish the integrity of the Circuit, and/or the employee's credibility or capability to perform as an employee of the Circuit; (5) impropriety and the appearance of impropriety; and (6) abuse of position. According to Defendant, Plaintiff violated these policies by presenting his official five-pointed badge to

---

[2] Pursuant to the Employee Handbook, it was essential to his continued employment that he maintain the confidence in his ability to discharge his responsibilities and command the "trust and confidence of the Chief Judge."

[3] Principal Four of the Ethics Policy requires employees to avoid impropriety and the appearance of impropriety; respect and comply with the law and conduct himself or herself at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary; refrain from engaging in any activity that would put into question the propriety of the employee's conduct in carrying out the duties of the office or cast doubt upon the integrity and impartiality of the legal system; and not allow family, social, or other relationships to influence official conduct or judgment and should avoid any conduct that gives the impression that the employee can be improperly influenced in the performance of his or her official duties. Principal Five of the Ethics Policy requires employees to demonstrate the highest standards of personal integrity, honesty, and truthfulness in all professional and personal dealings, and prohibits employees from using his or her position, badge, or any form of identification of the Nineteenth Judicial Circuit to secure unwarranted privileges or exemptions for himself or herself or for a family member or close relative.

Officer Platt as he approached the window of Plaintiff's vehicle and upon exiting the vehicle; allowing his passenger to smoke a "blunt" while he was driving; and telling Officer Platt that there was not anything in the vehicle he should know about, even though a bag of cannabis and a switch-blade knife were in the center console and an opened bottle of tequila was behind the driver's seat. Plaintiff does not dispute that he engaged in this conduct or that this conduct violated Defendant's policies, except that he challenges whether the policies prohibited him from presented his five-point badge during the traffic stop. This challenge is insufficient to create a material issue of fact concerning whether Plaintiff was meeting Defendant's legitimate expectations, given the absence of a defense to the other allegations.

Plaintiff argues, however, that since he has "'produce[d] evidence sufficient to raise an inference that [Defendant] applied its legitimate expectations in a disparate manner ... the second and fourth prongs merge—allowing [him] to stave off summary judgment for the time being'" by showing that he was treated more harshly than employees who engaged in comparable misconduct but were not members of Plaintiff's protected class. [73] at 10 (quoting *Elkhatib v. Dunkin Donuts, Inc.,* 493 F.3d 827, 831 (7th Cir. 2007)). This is an accurate statement of governing law, see *id.*, *Orton-Bell v. Indiana*, 759 F.3d 768, 777 (7th Cir. 2014), and *Huang v. Continental Cas. Co.*, 754 F.3d 447, 450 (7th Cir. 2014), and therefore the Court turns to prong four.

To survive summary judgment "by showing differential treatment of a similarly situated employee, a plaintiff must identify a comparator who is 'directly comparable to [him] in all material respects.'" *Williams v. Office of Chief Judge of Cook Cnty. Ill.*, 839 F.3d 617, 626 (7th Cir. 2016) (quoting *Perez v. Thortons, Inc.*, 731 F.3d 699, 704 (7th Cir. 2013)). "The goal of the comparison analysis is to eliminate other possible explanatory variables, such as differing roles,

performance histories, or decision-making personnel, which helps isolate the critical independent variable—discriminatory animus." *Formella v. Brennan*, 817 F.3d 503, 512 (7th Cir. 2016) (internal quotation marks and citation omitted). A "difference in job title alone is not dispositive" where comparators' similarities nonetheless predominate. *Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 791 (7th Cir. 2007). Typically, a plaintiff needs to show that the other employee "dealt with the same supervisor, [was] subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish [his] conduct or the employer's treatment of [him]." *Gates v. Caterpillar, Inc.,* 513 F.3d 680, 690 (7th Cir. 2008) (internal quotation marks and citation omitted).

The only comparator that Plaintiff offers is Employee X, who was demoted and placed on probation after being arrested for driving under the influence of alcohol and refusing to take a field sobriety test. This single comparator is not sufficient to withstand summary judgment because there are too many differentiating circumstances that, taken together, distinguish Defendant's treatment of Plaintiff from its treatment of Employee X. Employee X received a DUI in 2004, nine years before Plaintiff was arrested. The older the comparator case, the more likely the difference in treatment was due to changes in policies, personnel, and attitudes over the intervening years. Here, there is no evidence that Defendant's stance toward employees who were arrested for drug or alcohol related offenses remained the same from the time of Employee X's arrest to Plaintiff's arrest. The lack of temporal proximity between Plaintiff's misconduct and Employee X's misconduct, along with Defendant's personnel changes over the intervening years (discussed in the next paragraph), lead the Court to conclude that Defendant's allegedly preferential treatment of Employee X nearly a decade ago would be an insufficient basis for any reasonable factfinder to conclude that Plaintiff's termination was motivated by discriminatory

animus.  See, e.g., *Demick v. City of Joliet*, 135 F. Supp. 2d 921, 939 (N.D. Ill. 2001) (female firefighter whom the city removed from eligibility list when she reached age 35 could not make out prima facie case for gender discrimination based on evidence one male police officer was appointed from eligibility despite having turned 35, because "this one instance-which occurred over thirteen years ago-is not sufficient to allow a reasonable jury to find that similarly-situated males were treated more favorably"); *Bilow v. Much Shelist Freed Denenberg Ament & Rubenstein,* 96 F. Supp. 2d 763, 769 (N.D. Ill. 2000) (a "single instance of alleged discriminatory treatment by [plaintiff's employer] nine years before the staffing decision at issue [in plaintiff's suit for discriminatory staffing] is insufficient to support her claim that similarly situated male employees were treated better"); *Quick v. City of Fort Wayne*, 2016 WL 5394457, at *5 (N.D. Ind. Sept. 27, 2016) (ADA plaintiff who was terminated by police department for failing to complete academy was not similarly situated to two non-disabled employees who were permitted to substitute a certification for academy attendance, where the non-disabled employees were "hired years before" plaintiff at a time when the department was in need of Spanish-speaking officers); cf. *Purze v. Village of Winthrop Harbor*, 2000 WL 1741895, at *2 (N.D. Ill. Nov. 22, 2000) (village was entitled to summary judgment on plaintiffs' claim that village violated their right to equal protection by refusing their request for a zoning variance, where two instances in which allegedly similarly situated property owners were granting zoning variances "occurred ten years ago").

As alluded to above, the decisionmaking personnel involved in Plaintiff's case were different than those involved in Employee X's case.  It is undisputed that only the Chief Judge has the authority to terminate a probation officer.  Plaintiff was terminated by Chief Judge Foreman, while Employee X was disciplined by former Chief Judge Mullen.  Plaintiff argues,

nonetheless, that Chief Judge Foreman's "approval was basically a rubber stamp" of Cesar's and Zastany's recommendations because "there is no evidence, whatsoever, that the Chief Judge did an independent investigation other than his one sentence letter stating that he 'reviewed the matter.'" [73] at 13. Plaintiff further maintains that even if Chief Judge Foreman "did do an independent investigation, … this would still not insulate Defendant from liability as there is no question that Mr. Zastany's recommendation was a causal factor of Plaintiff's termination, and pursuant to *Staub v. Proctor Hosp*., 562 U.S. 411, 411 (2011), "[i]f a supervisor performs an act motivated by [impermissible] animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable." [73] at 13.

Although Plaintiff does not identify the legal theory under which Cesar's or Zastany's alleged discriminatory animus could be attributed to Chief Judge Foreman's ultimate decision to terminate Plaintiff, the case law refers to it as the "cat's paw" theory of liability. The term "cat's paw" comes from an Aesop's fable, first referenced in discrimination law by Judge Posner, in which "a monkey induces a cat by flattery to extract roasting chestnuts from the fire," and "[a]fter the cat has done so, burning its paws in the process, the monkey makes off with the chestnuts and leaves the cat with nothing." *Staub*, 562 U.S. at 416. "The cat's paw theory applies in the employment discrimination context when 'a biased subordinate who lacks decision-making power uses the formal decision maker as a dupe in a deliberate scheme to trigger a discriminatory employment action.'" *Johnson v. Koppers, Inc*., 726 F.3d 910, 914 (7th Cir. 2013) (quoting *Smith v. Bray,* 681 F.3d 888, 897 (7th Cir. 2012)); see also *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017). "The cat's paw theory requires both evidence that the biased subordinate actually harbored discriminatory animus against the victim

of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Johnson*, 726 F.3d at 914.

Cesar cannot be deemed a biased subordinate who controlled the Chief Judge because Cesar was not a decisionmaker in Employee X's case and the alleged preferential treatment of Employee X is the only evidence of discriminatory animus that Plaintiff offers. Loud, not Cesar, was the Director of Juvenile Probation in 2004, when Employee X was disciplined. Loud decided that disciplinary action needed to be taken and offered Employee X a demotion and probation in lieu of bringing his arrest before an investigatory hearing panel. Cesar was the Assistant Director of Probation at that time. Although he had authority to recommend the termination of an employee and knew that Employee X had been arrested for DUI or possession of alcohol while driving and lost his license, it is undisputed that Cesar was not Employee X's supervisor, did not oversee Employee X, was not a part of any disciplinary action taken against Employee X, and did not know that Employee X had allegedly failed to cooperate with the arresting officer.

No reasonable factfinder could conclude based on these facts—essentially that Cesar decided not to insert himself into Loud's disciplinary decisionmaking to recommend termination of an employee he did not oversee—that Cesar's recommendation to terminate Plaintiff nine years later was based on discriminatory animus. To the extent that Plaintiff is complaining about Cesar not terminating Employee X when, five years after his DUI, Employee X smelled like alcohol at work on one occasion, that alleged misconduct is not sufficiently comparable to Plaintiff's misconduct to create a material question of fact. During that incident, Employee X was not arrested or found with alcohol or drugs, like Plaintiff was when Officer Platt pulled his vehicle over for speeding.

In contrast to Cesar, Zastany was the Executive Director both when Employee X was disciplined and when Plaintiff was terminated. Therefore, the Court must evaluate whether Plaintiff has presented sufficient evidence that (1) Zastany actually harbored discriminatory animus against Plaintiff and (2) Zastany's scheme to have Plaintiff terminated was the proximate cause of the Chief Judge's decision to terminate Plaintiff, such that the cat's paw theory of liability could apply.

Viewing the evidence in the light most favorable to Plaintiff, the Court concludes that the evidence is too attenuated to permit any reasonable factfinder to conclude that Zastany harbored discriminatory animus against Plaintiff and therefore insufficient to survive summary judgment. Again, the only evidence of Zastany's discriminatory motive is his allegedly more preferential treatment of Employee X nine years earlier. However, in both Plaintiff's case and Employee X's case, Zastany followed the director's recommendation about what disciplinary action should be taken. In other words, Zastany treated Plaintiff and Employee X the same by concurring with the recommendations of their direct supervisors. Plaintiff's supervisor, Cesar, recommended termination, while Employee X's supervisor, Loud, offered not to send Employee X's case on for further investigation if he agreed to a demotion and probationary period (which he did). It would be a different matter if, in Employee X's case (or any other case involving a white employee), Zastany overruled the director's recommendation in favor of more lenient treatment of a white employee. But there is no evidence to support such a theory.

Nor is there any evidence that Zastany provided the Chief Judge with any false information, rather than simply passing on Cesar's and Jumisko's recommendation that Plaintiff be terminated. In this regard, the Court is guided by *Lindsey v. Walgreen Co*., 615 F.3d 873 (7th Cir. 2010), in which a pharmacist brought suit against her former employer under the Age

Discrimination in Employment Act ("ADEA") under a cat's paw theory of liability. Cf. *Raymond v. Ameritech Corp.*, 442 F.3d 600, 610 (7th Cir. 2006) ("The McDonnell Douglas framework applies to both Title VII and ADEA claims."); *Rabe v. United Air Lines, Inc.*, 971 F. Supp. 2d 807, 821 (N.D. Ill. 2013) (analyzing Title VII and ADEA claims using same "cat's paw" theory of liability). The plaintiff in *Lindsey* argued that her coworker, who allegedly harbored discriminatory animus against her because of her age, manipulated her supervisor's decision to terminate her. The Seventh Circuit affirmed the district court's grant of summary judgment to the defendant, concluding that the cat's paw theory did not apply in part because, even if the plaintiff's supervisor "blindly relied" on information from her coworker, the plaintiff "failed to show that the information [the coworker] gave to [the supervisor] was biased." *Lindsey*, 615 F.3d at 876. The court explained that, "[i]nstead of highlighting evidence that [her co-worker] concealed or pointing to falsehood that she presented as facts," the plaintiff "cites the inappropriate remarks about her age that she says [the coworker] made on other occasions." *Id.* "Showing that [the co-worker] uttered offensive slurs, however, does not establish that she manipulated [the supervisor's] decision" to terminate the plaintiff. *Id.*

Likewise in this case, even if the Chief Judge unquestionably accepted Zastany's termination recommendation, Plaintiff has come forward with no evidence that Zastany concealed any relevant information from or provided any falsehoods to the Chief Judge. *Lindsey*, 615 F.3d at 876. Plaintiff does not contest that he was pulled over for speeding or that marijuana, alcohol, and a switchblade were discovered upon a search of his car. Nor, for the most part, does Plaintiff contest that he violated the Court policies outlined in Cesar and Jumisko's termination letter. While Plaintiff disagrees with the letter's conclusion that Plaintiff's presentation of his badge to the arresting officer violated the court's policy against

using his badge in an unprofessional manner, that is a difference of interpretation of how the policy should apply to the facts, not a misrepresentation of any relevant facts.  Instead, as proof of bias Plaintiff cites only Zastany's treatment of Employee X nine years earlier when Employee X was arrested for a DUI.  This evidence "does not establish that [Zastany] "manipulated [the Chief Judge's] decision" to terminate Plaintiff after he was arrested.  *Id.*; see also *Roberts v. Columbia College Chicago*, 821 F.3d 855, 866 (7th Cir. 2016) (employer entitled to summary judgment on plaintiff's theory that subordinate's hostility against plaintiff on account of his age could be imputed to the decisionmaker due to the subordinate's involvement in the termination process where, among other things, there was no evidence that the memorandum the subordinate provided to the decisionmaker was inaccurate).

In short, the evidence that Zastany went along with Loud's recommendation to put Employee X on probation nine years previously for receiving a DUI, but did not overrule Cesar's and Jumisko's recommendation to terminate Plaintiff for being arrested with marijuana, an open container of alcohol, and a switchblade in his vehicle (a recommendation that is not tainted by any evidence of racial animus) is at most a "scintilla" of evidence of discriminatory bias and therefore insufficient to withstand summary judgment based on a "cat's paw" theory of liability. *Liberty Lobby*, 477 U.S. at 252.  Therefore, Plaintiff cannot demonstrate a triable issue of fact in regard to whether he is similarly situated to Employee X—or any other employee who is not a member of his protected class—and fails to make out a prima facie case of employment discrimination.

## IV. Conclusion

For the reasons explained above, the Court grants Defendant's motion for summary judgment [57].  Judgment will be entered in favor of Defendant.


Dated: March 26, 2018

Robert M. Dow, Jr.
United States District Judge